## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **WILLIAM B.[1],** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 3:22-cv-02652-GCS** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on November 30, 2016, alleging disability from May 15, 2014. (Tr. 157-160). Plaintiff alleges several impairments, including depression and anxiety. Initially, Plaintiff was denied DIB by the Administrative Law Judge ("ALJ") on March 20, 2019. (Tr. 23-41). However, after various administrative proceedings, the United States District Court for the Southern District of Illinois remanded the case for further proceedings in September 2021. (Tr. 586-595). A subsequent hearing took place in front of the ALJ on June 30, 2022. (Tr. 533-555). The ALJ once again denied Plaintiff DIB

---

[1]      Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

on July 29, 2022. (Tr. 510-532). This became the final decision of the Commissioner, making it final and appealable. Plaintiff then filed the present action pursuant to 42 U.S.C. § 405(g) on November 11, 2022. (Doc. 1).

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

I.   **The ALJ improperly relied on vocational expert ("VE") testimony in determining that Plaintiff could perform work at Step Five:** Plaintiff alleges that the VE used an unreliable methodology to conclude that the jobs of casting machine tender, riveting machine operator, and boring machine tender existed in significant numbers. As such, Plaintiff contends that the VE testimony does not amount to substantial evidence, and as a result, the ALJ failed to meet her burden at Step Five.

II.   **The ALJ improperly formulated the mental residual functional capacity ("RFC") by failing to adequately account for limitations that were established by the ALJ.** Plaintiff alleges that the ALJ was required to include additional limitations in her RFC based on her finding that he needs a "low stress" work environment.

(Doc. 17, p. 1, 8-14).

## APPLICABLE LEGAL STANDARDS

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his or her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

The scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analysis detailed above. (Tr. 513-526). She determined that Plaintiff had not worked at a level of substantial gainful activity since the alleged onset date of May 15, 2014, through his last insured date for disability benefits on December 15, 2018. (Tr. 515). The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 516).

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> He could maintain the concentration required to understand, remember, and carry out simple, and routine tasks. The claimant could not work at a fast pace such as in an assembly line, where other work functions would have been dependent on his completion of a task. He could stay on task and meet reasonable production requirements in an environment that allowed him to maintain a flexible and goal-oriented pace. The claimant was limited to work requiring only occasional changes in the work setting, which were introduced gradually. He could function in an environment requiring occasional and superficial interaction with co-workers and supervisors, but

he should not have been required to interact with the public.

(Tr. 518). As such, the ALJ denied Plaintiff at Step Five and determined that he would be able to perform the requirements of representative occupations such as casting machine tender (DOT 556.685-090, medium exertional level, SVP 2, 100,000 jobs nationally), riveting machine operator (DOT 616.685-058, medium exertional level, SVP 2, 37,000 jobs nationally), and boring machine tender (665.685-018, medium exertional level, SVP 2, 30,000 jobs nationally). (Tr. 525).

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

A.    *Evidentiary Hearing*

During the evidentiary hearing, the ALJ asked Plaintiff to explain in his own words, why he felt as though he would not be able to perform any job. (Tr. 546). Plaintiff explained that he has "severe social anxiety, . . . so it's tough for [him] to even leave the house or go outside." *Id.* He noted that when you couple that stress "with the stress of co-workers, and being at work, and job performance, it just becomes too much, . . . and [he] can't handle it." *Id.* In response to these stressful situations, Plaintiff reportedly runs away to hide somewhere or goes to the restroom, and when escape is not possible, he becomes irritable to the point of lashing out at others. *Id.* Plaintiff also indicated that his depression makes it tough for him to stay focused and motivated. *Id.*

The ALJ then asked Plaintiff to describe any prior instances when he lost a job due

to his anxiety. Plaintiff replied that he lost his previous job as a desktop support specialist because he would get very nauseous before work and throw up. (Tr. 546). He explained that after a while, he started calling off twice a week because he was so nervous about going into work. *Id.* Plaintiff also recounted that he lost his job as a cook because he lashed out at one of his co-workers. (Tr. 547).

Plaintiff was also asked by the ALJ to recall how often he left his home alone between May 2014 and the end of 2018. During this time, Plaintiff reported leaving his house once per week at most. (Tr. 547-548). Plaintiff left his home to go to his parent's house to "help his father out with things" and to keep an eye on his elderly grandmother. (Tr. 548). Plaintiff noted that he had even hired help to cut his own yard because going outside on his own porch caused him to sweat, become dizzy, and hyperventilate. *Id.* Plaintiff did not go to the grocery store during this time, nor did he enjoy any leisure activities outside the home with his wife. (Tr. 549).

Plaintiff's treatment between May 2014 and December 2018 consisted of seeing a counselor every two weeks for one hour and an appointment with a psychiatrist once every three months for "five minutes." (Tr. 549). Plaintiff believed that this treatment only resulted in an "incremental improvement" in his condition. *Id.* As a part of his treatment, Plaintiff would also attempt to go to places outside his home alone. *Id.* However, he never made it to where he was supposed to go because he would experience panic attacks and was forced to return home. (Tr. 549-550).

The ALJ then conducted an examination of the Vocational Expert ("VE"). (Tr. 551-553). The ALJ requested that the VE consider the following limitations, when responding

to her hypothetical questions:

> [P]lease assume an individual of the claimant's age and education with those past jobs that you just talked about. So, we have no exertional limitations. We have mental limitations only. The individual can maintain the concentration required to understand, remember, and carry out simple and routine tasks; cannot work at a fast pace such as an assembly line where other work functions would . . . depend on that individual's completion of a task. The individual can stay on task and make reasonable production requirements in an environment that would allow the individual to maintain a flexible and goal-oriented pace; limited to work that requires only occasional changes in the work setting, which are introduced gradually; occasional and superficial interaction with co-workers and supervisors, but no interaction with the public.

(Tr. 551-552). The VE stated that based on these limitations, an individual would not be able to perform Plaintiff's prior work. (Tr. 552). However, the VE reported that alternative work was available. *Id.* The VE indicated that medium, SVP 2, unskilled jobs such as casting machine tender, DOT code 556.685-090, with 100,000 jobs nationally, riveting machine operator, DOT code 616.685-058, with 37,000 jobs nationally, and boring machine tender, DOT code 665.685-018, with 30,000 jobs nationally would be viable employment options. *Id.* The VE reported that such testimony was consistent with the DOT. *Id.*

The ALJ then asked the VE if employment would be available for an individual with the same limitations, except that the individual also could not have any interaction with co-workers or supervisors. (Tr. 553). The VE replied that no employment would be available for such an individual. *Id.* The ALJ also asked if an individual was going to be off task for twenty percent of the workday or was absent two or more days per month if they would have access to competitive employment options. *Id.* The VE responded that

such limitations would also eliminate all competitive employment options for said hypothetical individual. *Id.*

Lastly, Plaintiff's attorney asked the VE to detail the methodology she used to estimate the job numbers detailed during the hearing. The VE replied:

> I do a variety of things. There's no magic bullet for this. I'm aware of the Department of Labor and Statistics. I've seen – I see and evaluate those. I have Job Browser, which I don't use very much, because I find it's all based on the SOC as well as the DOT – the Department of Labor, but then I also base it on my experience: how I've looked at and evaluated work in the past to determine whether or not there would be reasonable expectations for these jobs to exist and from that, I do make estimations of the numbers that would exist and the kinds – and that's based on the industries they're in and then the types of places I've placed people in these kinds of occupations.

(Tr. 554). Plaintiff's attorney did not question the vocational expert further.

### B.   *Plaintiff's Post-Hearing Brief*

On June 30, 2022, Plaintiff's attorney filed a post-hearing brief objecting to the vocational expert, Janice Hastert's testimony regarding job numbers. (Tr. 719). Plaintiff's objection stated that "[t]he VE's opinions as to job incidence data lacks a reliable methodology." *Id.* Specifically, Plaintiff's attorney asserted that the VE's testimony failed to communicate any "specific confirmable methodology" or any "evidence that the VE's methods for obtaining job incidence data are reliable and well accepted." *Id.* Thus, Plaintiff's attorney asserted that the VE's record is unacceptably vague and failed to satisfy the Commissioner's burden at Step Five. *Id.*

The ALJ overruled Plaintiff's post-hearing objection in her decision. (Tr. 525-526). The ALJ noted that Plaintiff's attorney had the opportunity to cross examine the

vocational expert during the hearing, when she explained her methodology for obtaining job numbers. Additionally, the ALJ recognized that Ms. Hastert had an expansive background in the field that spanned many decades and was fully qualified to offer an opinion regarding job numbers in the case. (Tr. 526).

## C.   *Relevant Medical Records*

Relevant portions of Plaintiff's medical records and reports are discussed below.

### 1.   *February 2017 Function Report*

In Plaintiff's 2017 Function Report, Plaintiff indicated that his diagnosis of generalized anxiety disorder, social anxiety, panic attacks, and symptoms of PTSD had all limited his ability to work. (Tr. 188). Plaintiff noted that there were only two instances when he would leave his home: (1) to go to a doctor or therapist appointment; and (2) to go to his parent's home. (Tr. 189). Plaintiff reportedly stayed inside, cleaned, took care of pets, cooked dinner, and engaged in other household chores while he was at home. *Id.* However, Plaintiff needs a "proxy" to go to the store to collect ingredients for the meals he prepares. (Tr. 190). He also reported that he does not do any chores outside the home because he does not feel safe. (Tr. 191).

Plaintiff also indicated that his anxiety negatively impacted his ability to sleep. He stated that the "anxiety makes it hard to relax therefore sleep is long in coming." (Tr. 189). Other times, he noted that his depression has made it feel like "it[']s pointless to get up." *Id.* Plaintiff stated that his hobbies and interests include watching the news and movies, as well as reading and playing games. (Tr. 192). He reported that he engages in these activities everyday with no issues. *Id.* However, he no longer plays online games with

friends and only engages in solo play and is more focused on the news and "unsettling events." *Id.* He also stated that he only feels comfortable around a very small group of people in a safe environment and does not talk to his neighbors. (Tr. 193).

Plaintiff then went on to state that his illnesses and conditions have had a detrimental impact on his ability to talk, to get along with others, and to concentrate. (Tr. 193). In a work situation or public setting, Plaintiff struggles to find words to communicate effectively, as he fumbles over his words and struggles to concentrate. *Id.* However, he noted that he does not struggle in paying attention and can follow written or verbal instructions. *Id.*

Plaintiff reported that he had not been fired or laid off from a job because of problems getting along with other people. (Tr. 194). He also noted that he does not handle stress well and that "any external stress puts [him] in a near panic state." *Id.* He expressed fears going outside, being in a public setting, and taking on responsibility. *Id.*

2.    *March 2017 Consultative Exam performed by Stephen G. Vincent*

Stephen G. Vincent, a licensed clinical psychologist, conducted a mental status assessment of Plaintiff on March 23, 2017. (Tr. 345). Plaintiff reported to Dr. Vincent that his depression was problematic and caused him to withdraw and to isolate which made him feel useless and worthless at times. *Id.* He indicated that he experiences panic attacks that are abrupt and accompanied by physical and cognitive symptoms, such as forgetfulness, preoccupation with psychological disturbances, heart palpitations, sweating, chest pain, and shaking. (Tr. 346). Plaintiff described himself as "worried and unenthusiastic[.]" (Tr. 345). He also informed Dr. Vincent that he struggles with fatigue,

motivation, ambition, and feelings of indifference towards himself and others. (Tr. 346). Based on his psychological examination, Dr Vincent's diagnostic impressions of Plaintiff included panic disorder, agoraphobia, generalized anxiety disorder, and major depression. (Tr. 348).

> 3.      *March 2017 Consultative Exam performed by Raymond Leung*

Raymond Leung, a medical doctor, conducted an internist examination of Plaintiff on March 23, 2017. (Tr. 350-355). Regarding Plaintiff's mental status, Dr. Leung observed that Plaintiff was alert, oriented, and cooperative during the examination; his affect, dress, and hygiene were also within normal limits. (Tr. 351). He also observed that Plaintiff was not in any apparent distress at the time. *Id.*

> 4.      *Summary of Plaintiff's Medical Records from 2014 to 2018*

Plaintiff saw Nurse Practitioner ("NP") Denise Schleeper on August 19, 2014. (Tr. 247). At this visit, Plaintiff reported that his depression was under control with the current therapy. He also denied any depressive symptoms with the current dosage of his medication. Plaintiff reported that "functioning was not difficult at all." *Id.* While Plaintiff reported that he was having difficulty staying asleep, he denied any anxious/fearful thoughts, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, excessive worry, fatigue, and thoughts of death or suicide. *Id.*

Plaintiff began to seek consistent mental health treatment in 2015. During a mental health assessment on January 29, 2015, Plaintiff reported that he had been having suicidal ideations for the past three days, but he denied having seriously considered suicide. (Tr. 259). Although Plaintiff appeared to be anxious during the assessment, his attention,

speech, psychomotor behavior, eye contact, posture, and train of thought appeared to be normal. *Id.* Plaintiff reported that his anxiety led him to total withdrawal from social interaction for weeks at a time. (Tr. 265). He also noted that he would only go outside the house if he did not have a choice. *Id.* Large group social interactions also caused him to experience panic attacks. *Id.*

On July 16, 2015, Plaintiff had an appointment with Psychiatrist Dr. Arif Habib. (Tr. 279). Plaintiff reported that he was experiencing excessive worrying and trouble tolerating crowds. *Id.* However, he denied any psychotic or manic symptoms. *Id.* Plaintiff's mental status examination was unremarkable. He displayed a cooperative attitude and normal appearance with good eye contact, focus, and motivation. *Id.* Though he remained anxious, Plaintiff also displayed good memory, insight, and judgment. *Id.* His thought processes were also observed to be logical, and goal directed. *Id.*

Plaintiff followed up with Dr. Habib on several occasions throughout 2016. On January 22, 2016, Plaintiff reported that he "had to quit Wellbutrin and Effexor because of hand tremors." (Tr. 328). At this time, he reported that he was still experiencing anxiety and obsessive thoughts, but he denied experiencing hallucinations, delusions, or any manic or hypomanic symptoms. *Id.* At the visit on March 3, 2016, Plaintiff reported "doing better" – remarking that his anxiety was almost "40 percent better." (Tr. 325). On August 18, 2016, Plaintiff saw Dr. Habib once again. (Tr. 319). Plaintiff reported "doing better" and that his mood was stable. *Id.* He denied that he was experiencing panic attacks but noted that he still experiences social anxiety. Despite that, Plaintiff reported that he was attending church with his wife. *Id.*

On September 19, 2016, Plaintiff saw Licensed Clinical Professional Counselor ("LCPC") Matthew Weusthoff at Centerstone of Illinois. (Tr. 296). Weusthoff diagnosed Plaintiff as presenting with Major Depressive Disorder and Social Phobia. (Tr. 304). Weusthoff noted that Plaintiff's social phobia frequently triggers panic symptoms, including sweating, heavy breathing, and dizziness, so much so that he often avoids social situations altogether. *Id.* Weusthoff also noted that Plaintiff has had difficulty maintaining employment and social relationships because of his anxiety. *Id.*

Plaintiff continued treating with Dr. Habib throughout 2017. On February 23, 2017, Plaintiff reported that he "ha[d] more anxiety at times," but denied experiencing hopelessness, hallucinations, delusions, and manic or hypomanic states. (Tr. 369). At the visit on June 8, 2017, Plaintiff reported he was "feeling better" and that his medication was providing him with "major symptom relief." (Tr. 371). In August 2017, when he had a follow-up appointment with Counselor Weusthoff, Plaintiff "couldn't recall a recent panic attack" and said that his last panic attack likely occurred during the previous Christmas season. (Tr. 392). Weusthoff observed Plaintiff's mental status to be completely normal, with clear speech, a logical thought process, no attention deficits, an intact memory, and a well-groomed appearance. (Tr. 397-398).

During an encounter with NP Schleeper when Plaintiff was seeking treatment for heartburn in July 2018, Plaintiff was observed to be fully alert and oriented, with a normal mood and affect. (Tr. 383). Plaintiff began seeing a new counselor at Centerstone of Illinois, Thomas Schmidt, on August 2, 2018. (Tr. 452). Schmidt described Plaintiff as presenting with Major Depressive Disorder, recurrent, moderate, as demonstrated by his

reports of a depressed mood. (Tr. 455). He also recognized that Plaintiff suffered with Social Anxiety Disorder "as evidenced by severe anxiety induced by exposure to being in groups of people and interacting with strangers." *Id.* During the yearly assessment, Plaintiff reported that his medications were helping his depression somewhat, and his symptoms were less intense than they were when he first sought treatment in 2015. (Tr. 461).

The last medical documentation relevant to Plaintiff's alleged timeline of disability is from November 2018. On November 5, 2018, Plaintiff had a follow-up appointment with Dr. Habib. At the appointment, Plaintiff appeared to have a stable mood. (Tr. 493). Habib reported that Plaintiff was "alert, pleasant, cooperative, engaged, and well groomed. *Id.* Habib also noted that Plaintiff's thought process was linear and logical and that his thought center was without any auditory or visual hallucinations. *Id.*

5.   *Medical Opinion of Melanie Nichols, Ph.D.*

Dr. Melanie Nichols conducted a review of Plaintiff's mental RFC on July 17, 2017. (Tr. 81-83). Nichols determined that Plaintiff had the following sustained concentration and persistence limitations: a moderate limitation to carry out detailed instructions; a moderate limitation to maintain attention and concentration for extended periods of time; and a moderate limitation in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 82). Nichols elaborated on these limitations, noting that Plaintiff "is able to perform short repetitive tasks in a setting with flexible pace and production requirements." *Id.*

Nichols also found that Plaintiff had limitations pertaining to social interactions.

(Tr. 82-83). After reviewing Plaintiff's updated medical records, Nichols found that Plaintiff had the following:  a moderate limitation to his ability to interact appropriately with the general public; a moderate limitation to accept instructions and respond appropriately to criticism from supervisors; and a moderate limitation to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Nichols specifically determined that Plaintiff was capable of interacting "superficially with a small group of familiar coworkers in a non-public setting."(Tr. 83).

Accordingly, Nichols concluded that Plaintiff did not "allege any worsening in mental condition and no mental diagnosis." (Tr. 83). Nichols opined that Plaintiff's additional medical record evidence showed improvement towards his mental health goals and that the evidence in the file affirmed the prior mental evaluation and disability determination. *Id.*

  6. *Medical Opinion of Courtney Zeune, Psy.D.*

Dr. Courtney Zeune conducted Plaintiff's initial mental RFC assessment on April 7, 2017. (Tr. 70-71). Zeune determined that Plaintiff had a sustained concentration and persistence limitation. Specifically, Zeune determined that Plaintiff had the following limitations: moderately limited in his ability to carry out detailed instructions; moderately limited in his ability to maintain attention and concentration for extended periods of time; and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 70). Zeune elaborated on these limitations by noting that Plaintiff "is able to perform short repetitive tasks in a setting with flexible pace and production requirements." *Id.*

Zeune also found that Plaintiff had social interaction limitations. (Tr. 71). Zeune found that Plaintiff was limited as follows:  moderately limited in his ability to interact appropriately with the general public; moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; and moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Zeune further determined that Plaintiff was able to "interact superficially with a small group of familiar co-workers in a non-public setting." *Id.* Lastly, Zeune determined that Plaintiff was able to "adapt to occasional minor changes in work routines." *Id.*

### 7.   *Third Party Function Report*

On February 5, 2017, Plaintiff's wife - Danielle B. – submitted a Third-Party Function Report. (Tr. 198-205). Mrs. B. reported that she has known Plaintiff for 19 years and spends six to twelve hours per day with him. (Tr. 198). She reported that Plaintiff's illnesses limit his ability to work in that "[h]e becomes visibly upset at the thought of leaving the house and interacting with others – both by phone and in person. His stress level skyrockets[,] and he starts having a panic attack." *Id.*

Mrs. B. also reported that although Plaintiff rarely goes outside, he can go outside alone and travels by car when he leaves the home. (Tr. 201). Regarding Plaintiff's social activities, Mrs. B. indicated that Plaintiff only interacts with his parents and his doctors. (Tr. 202). Mrs. B. described Plaintiff's social interactions as follows: "[h]e gets very nervous around virtually everybody. If I am not with him, he will get out of the situation as soon as possible."(Tr. 203). Mrs. B. also reported that Plaintiff has "no issues" with

attention and can follow written and spoken instructions. (Tr. 203-204).  She also noted that "he is ok" with changes in his routine, but he does not handle stress very well, as he "starts sweating and getting physically ill." (Tr. 204).

DISCUSSION

I.    **The ALJ properly relied on vocational expert ("VE") testimony in determining that Plaintiff could perform work at Step Five.**

Plaintiff first alleges that the Vocational Expert ("VE") failed to properly describe the methodology through which she determined the availability of local jobs in the economy that aligned with Plaintiff's RFC limitations. (Doc. 17, p. 3-7). Thus, Plaintiff believes the ALJ improperly relied on the VE's testimony, and thus her conclusion at Step Five was not supported by substantial evidence. *Id.* The Commissioner, however, asserts that the VE's testimony constitutes substantial evidence because her testimony was "the kind of evidence – far more than a mere scintilla – that a reasonable mind might accept as adequate to support a funding about job availability." (Doc. 25, p. 9) (quoting *Bistek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019)). The Court agrees with the Commissioner that the VE conveyed a clear and reliable methodology during her testimony to the ALJ. The ALJ's determination that Plaintiff could perform a significant number of jobs in the national economy was also supported by substantial evidence.

At Step Five, "[t]he Commissioner bears the burden of establishing that the claimant can perform other work that exists in significant numbers in the national economy." *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1560(c)(2)). The Commissioner satisfies this burden if it can show that the ALJ's

conclusion in this regard is supported by substantial evidence. *See Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). When the Commissioner's decision relies on job estimates from a vocational expert, the substantial evidence standard requires the ALJ "to ensure that the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). "A 'precise count is not necessary,' but the VE's testimony 'must be supported with evidence sufficient to provide some modicum of confidence in its reliability.'" *Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023) (quoting *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020)). A reliable methodology is based on "well-accepted sources." *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022). "Additionally, the VE must explain the methodology 'cogently and thoroughly,' and this explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Fetting*, 62 F.4th at 339 (quoting *Ruenger*, 23 F.4th at 763).

Here, the VE, Janice Hastert, testified that she used the Department of Labor and Statistics, and occasionally the Job Browser program to evaluate the availability of jobs that meet an individual's functional limitations. (Tr. 553-554). Ms. Hastert also relies upon her experience when calculating the employment figures, having "looked at and evaluated work in the past to determine whether or not there would be reasonable expectations for these jobs to exist."(Tr. 554). Ms. Hastert's résumé, contained within the record, readily demonstrates her experience and expertise in the realm of job placement and vocational counseling. (Tr. 717-718). Her résumé shows that she has performed vocational assessments, evaluations, and vocational case management consistently throughout her career since 1978. *Id.*

The Seventh Circuit has determined that relying upon such public sources, like the Department of Labor Statistics and Job Browser program, as well as relevant experience and expertise in job placement and career counseling, meet the reliable methodology standard. *See, e.g., Bistek,* 587 U.S. at 100 (citing Social Security Ruling, SSR 00-4p) (stating that "[w]hen offering testimony, the experts may invoke not only publicly available sources but 'information obtained directly from employers' and data otherwise developed from their own experience in job placement or career counseling.") Moreover, Courts within the Seventh Circuit have not required the VE's description to reveal the precise mechanics and statistical models involved to constitute a reasoned and principled methodological explanation. *See Tipsord v. Kijakazi*, Case No. 21-cv-03018, 2023 WL 6276489, at *6-7 (C.D. Ill. Sept. 26, 2023). *See also Chavez v. Berryhill*, 895 F.3d 962, 970 (7th Cir. 2018) (stating that "the VE could support the approximation by, for example, drawing on knowledge of the labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs."). VE Hastert provided her source materials and communicated that she relied on her experience in her testimony during the hearing. Thus, the Court will not remand on the ground that the ALJ improperly relied on the VE's testimony at Step Five.

**II.    The ALJ properly formulated the mental residual functional capacity ("RFC") and adequately accounted for Plaintiff's mental limitations.**

Plaintiff also asserts that the ALJ failed to incorporate his need for a "low stress work environment" in the RFC determination. (Doc. 17, p. 8-15). Plaintiff points to two alleged errors that the ALJ made when crafting his RFC determination. First, Plaintiff

believes the ALJ failed to account for his specific stress related limitations by failing to consider a third-party function report submitted by his wife, Danielle B. *Id.* at p. 10-11. In the third-party function report, Mrs. B. noted that Plaintiff does not handle stress very well and that Plaintiff starts "sweating" and gets "physically ill" when stressed. (Tr. 204). The Commissioner contends that the ALJ appropriately considered Mrs. B.'s third-party function report as the ALJ discussed her reasoning for only affording the report "minimal weight." (Doc. 25, p. 7). Specifically, the ALJ concluded that minimal weight was appropriate because "[Mrs. B.] is not an acceptable medical source and there is nothing convincing in her statements to outweigh the accumulated medical evidence."[2] (Tr. 523). Ultimately, the Court finds that the ALJ's consideration of the third-party function report was thorough and appropriate. Thus, the Court will not remand for the purpose of directing the ALJ to reweigh the weight afforded to the report.

Social Security Regulations provide that "[i]n addition to evidence from the

---

[2]     The ALJ's justification in full, for affording Mrs. B.'s Third-Party Function Report minimal weight, is reflected as follows:

> The Third-Party Function Report completed by the claimant's wife in February 2017 is afforded minimal weight in this decision (Exhibit 5E). She is not an acceptable medical source and there is nothing convincing in her statements to outweigh the accumulated medical evidence regarding the extent to which the claimant's impairments limited his functional abilities during the relevant period, when he was noted to be driving himself to appointments independently, going camping and attending a wedding reception, as discussed above. Furthermore, the level of function stated in this report would not preclude the claimant from performing simple, routine tasks in a low-stress working environment free of fast-paced production requirements and not requiring public contact or more than occasional interaction with supervisors and co-workers.

(Tr. 523).

acceptable medical sources . . . [ALJs] may also use evidence from other sources to show the severity of [a claimant's] impairments and how it affects [a claimant's] ability to work. Other sources include . . . nonmedical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy." 20 C.F.R. § 404.1513(d)(4). *See also* 20 C.F.R. § 404.1545(a)(3) (stating that "[w]e will consider descriptions and observations of your limitations from your impairment[s], including limitations that result from your symptoms such as pain, provided by you, your family, neighbors, friends, or other persons."). Hence, while lay witnesses do not have medical training, the regulations require the ALJ to consider their statements. *See Roque v. Colvin*, Case No. 15 C 392, 2016 WL 1161292, at *5 (N.D. Ill. Mar. 22, 2016). Moreover, an ALJ cannot discredit a third party's statement solely because of the third party's relationship, which may implicate bias with the claimant. *See, e.g.*, *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) (rejecting the implication . . . "that if a plaintiff or a defendant (or a relative of either – or a fiancée) testifies in a case, the testimony must automatically be discounted for bias . . . The administrative law judge should have made clear whether he believed the fiancée's testimony or not, . . . .").

In this case, the ALJ afforded the Third-Party Functional Report minimal weight, not only because of Mrs. B.'s status as a lay witness, but because her reports did not outweigh the accumulated medical evidence in the record. If the ALJs determination rested solely on the basis that Mrs. B. was a lay witness, the weight afforded to the report would be inappropriate and against the guidelines set out in Social Security Regulations. However, the ALJ noted that other medical evidence in the record as to the extent of

Plaintiff's impairments outweighed Mrs. B.'s observations. Specifically, the ALJ noted that during the relevant period Plaintiff reported "driving himself to appointment's independently, going camping, and attending a wedding reception." (Tr. 523). Thus, while Plaintiff may disagree with the interpretation of the evidence, it is inappropriate for the Court to ask the ALJ to reweigh the report. *See, e.g.*, *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (stating that "[w]e do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review.").

Plaintiff's second issue with the ALJ's formulation of the RFC is that he believes it failed to account for his difficulties handling increased responsibility or pressure. (Doc. 17, p. 13). Plaintiff contends that such limitations would likely limit him to "repetitive tasks", but he notes that the ALJ failed to include such a limitation in the RFC. *Id*. The Commissioner, on the other hand, argues that no evidence within the record required the ALJ to include such a limitation, and Plaintiff's specific stressors were well accounted for in the ALJ's RFC. (Doc. 25, p. 8). The Court agrees with the Commissioner and believes the RFC properly encapsulates Plaintiff's limitations when handling responsibility or pressure in the existing concentration, persistence, and pace ("CPP") limitation.

When evaluating mental impairments, an ALJ is required to apply a special technique at Steps Two and Three to evaluate medically determinable impairments and their respective limitations in four areas of functioning. *See* 20 C.F.R. § 416.920a. The four functional limitation areas, known as the Paragraph B criteria for mental impairments, include: (1) understanding, remembering, or applying information; (2) interacting with

others; (3) maintaining concentration, persistence, or pace ("CPP"); and (4) adapting or managing oneself. *See* 20 C.F.R. § 416.920a(d)(3). Even if a claimant cannot satisfy the listing criteria, the ALJ "must incorporate a claimant's limitations," including those that are not severe in developing the RFC. *Bruno v. Saul*, No. 19-3196, 817 Fed. Appx. 238, 242 (7th Cir. June 26, 2020). *See also Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (finding that when assessing RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."). The RFC should measure the tasks a person can perform given his or her limitations in the four areas, based on "all relevant evidence" in the administrative record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). *See also Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (noting that the Seventh Circuit will affirm an ALJ's RFC when it adequately accounts for a claimant's "demonstrated psychological symptoms.").

The Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . confining a claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence and pace." *Yurt v. Colvin*, 758 F.3d 850, 858-859 (7th Cir. 2014) (citations omitted). This is "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15, 1985 WL 56857, at *6. RFCs where "a claimant's limitations were stress or panic

related" have been allowed to stand when the claimant is restricted to "low stress work." *O'Connor-Spinner v. Astrue*, 627 F. 3d 614, 619 (7th Cir. 2010) (citing *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002)). Similarly, the court has allowed RFCs where, "although the limitations on concentration, persistence and pace were not mentioned in the hypothetical, the underlying conditions were." *Id.* at 620 (citing *Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009).

Here, the ALJ addressed Plaintiff's moderate limitations regarding his concentration persistence and pace. The ALJ specifically limited Plaintiff to "work [not] at a fast pace such as an assembly line where other work functions would . . . *depend on that individual's completion of a task*." (Tr. 518) (emphasis added). The inclusion of this limitation, which precludes Plaintiff from work that depended on his completion of a task, adequately addresses Plaintiff's inability to handle pressure and responsibility. Plaintiff reported being "afraid of responsibility" as one of his major stressors, and this limitation directly speaks to Plaintiff's concern. The RFC would limit Plaintiff only to jobs where he could complete tasks at a flexible and goal-oriented pace only, in line with the recommendations from both Dr. Nichols and Dr. Zeune. *See* (Tr. 81-83); (Tr 70-71).

The ALJ also addressed any increased pressures and stress resulting from Plaintiff having to deal with co-workers and supervisors. The evidence in the record clearly shows that the Plaintiff suffers from depression and anxiety, and Plaintiff has had trouble in various social and work settings. Despite these problems, the evidence also shows that the problems appeared to be managed and controlled through therapy and medication. *See, e.g.*, (Tr. 319) (noting in August 2016 that Plaintiff was doing better, mood was stable,

and Plaintiff was attending church services); (Tr. 371) (noting in June 2017 that Plaintiff was feeling better and that medications were providing major symptom relief); (Tr. 392) (noting in August 2017 that Plaintiff had no recent panic attacks since the previous Christmas season);  (Tr. 461) (noting in August 2018 that medications were helping Plaintiff's depression symptoms somewhat and his symptoms were less intense than when he first sought treatment in 2015). As such, the ALJ crafted an RFC which required only limited and occasional interaction with co-workers and supervisors and no interaction with the public. This is consistent with the recommendations from both Dr. Nichols and Dr. Zeune. (Tr. 83); (Tr. 71). It is also consistent with the evidence in the record indicating that Plaintiff could operate in small groups of people in a safe environment (Tr. 193) or with a familiar group of people as evidenced by the fact that Plaintiff self-reported he was attending church services (Tr. 371). Based on the record, the ALJ accurately and properly accounted for all of Plaintiff's mental limitations in the RFC. Accordingly, the Court will not remand for reconsideration on this basis either.

Conclusion

For the foregoing reasons, the Court **DENIES** the Claimant's Motion for Remand and **AFFIRMS** the Commissioner's decision.

**IT IS SO ORDERED.**

**DATED:  September 19, 2024.**

Digitally signed by Judge Sison
Date: 2024.09.19 10:19:24 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**